UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICK HUGHES,

                    Petitioner,

        v.                                            9:15-CV-0896

MICHAEL SHEAHAN,
Superintendent; Five Points
Correctional Facility,

                    Respondent.

_____

APPEARANCES:                                OF COUNSEL:

O'CONNELL & ARONOWITZ                        SCOTT W. ISEMAN, ESQ.
Attorneys for Petitioner
54 State Street, 9th Floor
Albany, New York 12207-2501

HON. ERIC T. SCHNEIDERMAN                    PRISCILLA I. STEWARD, ESQ.
Attorney General of the State of New York    Ass't Attorney General
Attorneys for Respondent
28 Liberty Street
New York, New York 10005

DAVID N. HURD
United States District Judge

## **TABLE OF CONTENTS**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.  RELEVANT BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.  LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    A.  AEDPA Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    B.  Exhaustion and Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    C.  Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    A.  Ineffective Assistance of Trial Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        1.  Failure to Object to Leading Questions and Bolstering Testimony. . . .  12
            a.  Leading Questions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
            b.  Bolstering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
        2.  Failure to Argue a Violation of the Ex Post Facto Clause. . . . . . . . . . . .  17
        3.  Failure to Object to the Scope of Expert Witness's Testimony. . . . . . .  19
        4.  Failure to Interview and/or Call Certain Prospective Witnesses. . . . . .  21
        5.  Failure to Investigate Potential Alibis. . . . . . . . . . . . . . . . . . . . . . . . . .  28
        6.  Failure to Present Certain Other Evidence. . . . . . . . . . . . . . . . . . . . . .  29
        7.  Failure to Investigate Petitioner's Medical Condition.  . . . . . . . . . . . . .  32
        8.  Failure to Present an Expert Witness Regarding False Confessions. .  32

    B.  Ineffective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . .  35

    C.  Involuntary Confession. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

    D.  Legal Sufficiency and Ex Post Facto Violation Regarding Count One.  . . . . .  43

        1.  Legal Sufficiency of the Evidence Regarding Count One. . . . . . . . . . .  43
        2.  Ex Post Facto Clause Violation.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

    E.  Legal Sufficiency of Other Counts and Double Jeopardy. . . . . . . . . . . . . . .  50

        1.  Regarding Counts Two, Three, and Four. . . . . . . . . . . . . . . . . . . . . . . .  51
        2.  Double Jeopardy-Related Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

<u>**MEMORANDUM–DECISION and ORDER**</u>

## I. <u>INTRODUCTION</u>

On December 1, 2015, petitioner Patrick Hughes ("Hughes" or "petitioner") filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent Michael Sheahan ("respondent") answered the amended petition on February 12, 2016, and petitioner filed a reply.

On June 9, 2016, this action was stayed in order to permit Hughes an opportunity to fully exhaust certain claims in state court. The stay was lifted on March 9, 2017, after petitioner's counsel informed the Court that petitioner had completed the exhaustion process. Thereafter, petitioner filed a supplemental memorandum of law and exhibits from his collateral state court proceedings, respondent filed a supplemental memorandum of law in response, and petitioner filed a reply memorandum of law.

Hughes raises the following grounds for habeas relief: (1) his trial counsel and appellate counsel rendered ineffective assistance; (2) his confession was obtained in violation of his rights under the Fifth Amendment; (3) his conviction for predatory sexual assault against a child was based on legally insufficient evidence and violated the *Ex Post Facto* Clause; and (4) his convictions on counts one through four of the indictment were based on legally insufficient evidence and violated principles of double jeopardy.

For the reasons that follow, the amended petition is denied and dismissed.

## II. <u>RELEVANT BACKGROUND</u>

On March 6, 2012, following a jury trial in the Albany County Supreme Court, Hughes was convicted of predatory sexual assault against a child in violation of N.Y. Penal

Law § 130.96, rape in the first degree in violation of Penal Law § 130.35(1), rape in the

second degree in violation of Penal Law § 130.30(1), and three counts of endangering the

welfare of a child in violation of Penal Law § 260.10(1).

The facts precipitating the charges against Hughes were later summarized as follows:

> When the police located defendant's 16-year-old stepdaughter after
> she ran away from home, she told them that she had been
> subjected to physical and sexual abuse by the 39-year-old
> defendant.  He then voluntarily spoke with police and, in a
> video-recorded interview, gave a written statement in which he
> admitted that he had "disciplined" the victim by making her fellate
> him and have sexual intercourse with him on at least four separate
> occasions.

*People v. Hughes*, 114 A.D.3d 1021, 1021 (N.Y. App. Div. 3d Dep't 2014).

After his conviction but prior to sentencing, Hughes filed a motion to set aside the

verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30.  The Albany County

Supreme Court denied his § 330.30 motion on May 22, 2012, and on June 5, 2012 the trial

court sentenced petitioner to an aggregate prison sentence of fifty years to life.  *Hughes*, 114

A.D.3d at 1021.

Hughes took a direct appeal in which he raised numerous arguments, but the Third

Department affirmed the judgment of conviction on February 20, 2014.  *Hughes*, 114 A.D.3d

at 1025.  In affirming his conviction, the Appellate Division rejected certain of petitioner's

arguments on the merits and concluded that his "remaining arguments were not preserved

for our review . . . and their inclusion in his posttrial CPL 330.30 motion is insufficient to

preserve them as issues for appeal[.]"  *Id*. at 1024.  Petitioner sought leave to appeal further,

but the New York Court of Appeals denied that application.  *People v. Hughes*, 23 N.Y.3d

1038 (2014).

4

On July 23, 2015, Hughes, through counsel, filed a petition for writ of habeas corpus, but as noted above the proceeding was stayed on June 9, 2016 to allow petitioner to exhaust his claims that trial counsel was ineffective for failing to (1) interview or call to testify at trial certain individuals identified by petitioner; (2) investigate petitioner's financial records and petitioner's medical condition; (3) call two individuals for purposes of impeaching the credibility of the victim, C.D. ("C.D." or "the victim"); (4) enter into evidence photographs of a garage and camp that would have supported his defense; (5) consult with or call an expert witness regarding false confessions and/or false memories; and that (6) his appellate counsel was ineffective for failing to argue that his confession was coerced.

On July 5, 2016, Hughes filed in state court a notice of motion for writ of error coram nobis, which the Third Department denied on August 17, 2016. On November 5, 2016, the Court of Appeals denied leave to appeal. *People v. Hughes*, 28 N.Y.3d 1072 (2016).

On July 7, 2016, Hughes, through counsel, also filed in state court a motion seeking to vacate his conviction pursuant to CPL § 440.10. The Albany County Supreme Court denied the motion on September 22, 2016 and, on November 28, 2016, the Third Department denied leave to appeal further. Thereafter, petitioner returned to federal court to pursue habeas relief in this action.

## III. LEGAL STANDARDS

### A. AEDPA Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision

(1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).  The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'"  *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103).

Additionally, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'"  *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779).  A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim

6

in the first instance would have reached a different conclusion.  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold."  *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence."  *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).  "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings."  *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).  Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]"  *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

## B.  Exhaustion and Procedural Default

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court, a requirement excused only if "there is an absence of available State corrective process" or where "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. §§  2254 (b)(1)(A), (B)(i), (ii).  "The exhaustion requirement 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings[.]'"  *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted); *Fama v. Comm'r. of Corr. Servs.*, 235 F.3d 804, 808 (2d Cir. 2000). In other words, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

"[W]hen a 'petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman v. Thompson*, 510 U.S. 722, 735 n.1 (1991)). Unexhausted claims may be deemed exhausted if "it is clear that the unexhausted claim is procedurally barred by state law," rendering presentation of the claim in state court "futile." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997)).

Procedurally defaulted claims are not subject to habeas review unless a petitioner shows cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice, i.e., that he or she is actually innocent. *House v. Bell*, 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327

8

(1995); *see also Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) ("'[A]ctual innocence means factual innocence, not mere legal insufficiency.").

To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman*, 501 U.S. at 753. If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

### C. <u>Ineffective Assistance of Counsel</u>

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different. *Premo*, 562 U.S. at 121-22; *accord Strickland v. Washington*, 466 U.S. 668, 694 (1984).

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks omitted). A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Even if a petitioner can establish that counsel was deficient, he still must show that he suffered

prejudice. *Strickland*, 466 U.S. at 693-94.

Meeting this burden is "never an easy task . . . [and] [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Premo*, 562 U.S. at 122 (citations and internal quotation marks omitted); *Burt v. Titlow*, 571 U.S. 12, 16 (2013) (noting that "AEDPA erects a formidable barrier" to federal habeas review of claims that have been adjudicated in state court).

When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105. Instead, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

## IV. DISCUSSION

### A. Ineffective Assistance of Trial Counsel

Hughes contends that his trial counsel was ineffective for numerous reasons discussed below. Respondent argues petitioner's various claims lack merit.

On direct appeal, the Appellate Division concluded that Hughes's trial counsel was not ineffective, explaining that

> the record reveals that trial counsel made appropriate pretrial
> motions, presented cogent opening and closing statements, pursued

10

> a reasonable defense, vigorously cross-examined the People's witnesses, presented an expert to rebut the People's expert witness and raised appropriate objections throughout the trial. Viewing the totality of the circumstances, we conclude that defendant received the effective assistance of counsel[.]

*Hughes*, 114 A.D.3d at 1024-25.

Similarly, in reviewing Hughes's CPL § 440.10 motion, the Albany County Supreme Court concluded that his trial counsel rendered effective assistance. In particular, the state court found that petitioner's trial counsel was "well prepared to try this case and exerted significant effort on defendant's behalf."

The record supports these conclusions. Before trial, Hughes's counsel made several motions, including motions to dismiss the indictment, to compel the production of information, and to suppress Hughes's statements to law enforcement officers. Trial counsel also moved to preclude testimony from numerous witnesses, arguing that such testimony would constitute hearsay from the victim, would not be probative of any material fact, and would "merely bolster the People's case."

At trial, Hughes's counsel pursued a credible theory of defense, arguing that C.D. was motivated by her dislike for petitioner, her stepfather, and the fact that she was forced to "split her [mother's] attention [and] affection" with him. In a cogent opening statement, trial counsel asserted that C.D. "didn't like" the family's "rules" that she "had to live by," and that she falsely accused petitioner of abusing her to avoid getting into trouble after she ran away from home and was discovered by the police.

Moreover, trial counsel argued that the videotaped interrogation demonstrated that Hughes had actually been coerced by law enforcement—who confronted him with false evidence—to provide an inculpatory, and untrue, statement. Petitioner's trial counsel also

11

made numerous objections to testimony or exhibits offered by the People.  Trial counsel also conducted vigorous cross-examination of the People's witnesses and moved for a trial order of dismissal at the close of the People's case and at the conclusion of evidence.

"[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," as it does here.  *Richter*, 562 U.S. at 111. Accordingly, and for the reasons discussed below, each of Hughes's ineffective-assistance claims will be denied.  Whether his ineffective-assistance arguments are considered individually or in combination, petitioner has failed to establish trial counsel's representation was deficient or that he was prejudiced.  As a result, the state courts' rejection of those claims were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor did they constitute an unreasonable determination of the facts in light of the evidence presented.

### 1. Failure to Object to Leading Questions and Bolstering Testimony

Hughes contends that his trial counsel was ineffective for failing to object to "leading and bolstering" questions posed to the victim "and other prosecution witnesses."  Respondent argues petitioner's claim lacks merit.

### a. Leading Questions

On direct appeal, Hughes argued that his trial counsel was ineffective for failing to object to leading questions posed to the victim "that were clearly designed to suggest the dates of the alleged offenses," and to a leading question posed to the victim regarding certain circumstances that followed petitioner's arrest.  However, the Third Department found that trial counsel, *inter alia*, pursued "a reasonable defense" and "raised appropriate

objections throughout the trial." *Hughes*, 114 A.D.3d at 1024.

Regarding the dates of the offenses, the record reveals that C.D.'s identification of when the "physical abuse started" was not in response to a leading question. Rather, the prosecutor's questions regarding the dates of the specific events underlying the charges were asked *after* the victim voluntarily stated when the "physical abuse started"; the questions at issue were asked to clarify the victim's then-extant responses. During the line of questioning, which included questions as to how old the victim was during various school years, the victim twice stated she was "confused" and agreed to have the prosecutor start the line of questioning over.

Regarding the victim's testimony about the circumstances following her allegations, the prosecutor asked C.D., "[a]nd after [Hughes] was arrested, you were the one thrown out of the house, right?"[1] That question was posed on redirect examination, after extensive questioning about the incidents at issue had already occurred.

Upon review, Hughes's trial counsel was not ineffective for refraining from objecting during this questioning. C.D. was seventeen years old at the time of the trial and was being questioned about sensitive and embarrassing subjects that occurred starting when she was approximately nine years old.

"Courts have recognized that while leading questions are generally not permissible on direct examination, there are some circumstances in which leading questions should be allowed 'as may be necessary to develop the witness' testimony.'" *Humphrey v. Fisher*, No. 9:07-CV-1200 (TJM/DRH), 2010 WL 7417094, at *14 (N.D.N.Y. July 23, 2010) (finding that

---

[1] After disclosing the abuse to law enforcement, C.D. moved out of the family residence and lived with her aunt. Petitioner was released on bail following his arrest and returned home.

"leading questioning did not amount to egregious misconduct since it was necessary to elicit testimony from the young victim" where the fifteen-year-old victim was "testifying about a sensitive and embarrassing subject" and "was clearly having difficulty formulating verbal responses"), *adopted by*, 2011 WL 4055407 (N.D.N.Y. Sept. 12, 2011).

In addition, a defendant's attorney might reasonably "choose not to object to some leading questions [so as] not to appear obstructionist and thus offend the jury." *Martina v. Rock*, No. 6:09-CV-6345, 2011 WL 1792916, at *8 (W.D.N.Y. May 10, 2011) (internal quotation marks omitted) (concluding that defense counsel reasonably elected not to object to leading questions "[g]iven the young age of the victim in th[e] case" and the "desire to stay in good standing with the jury").

To the extent the prosecutor may have asked leading questions in order to clarify when the abuse occurred and regarding certain events following Hughes's arrest, trial counsel was not deficient for refraining from objecting. Indeed, while trial counsel may have validly chosen to object to the prosecutor's question about C.D. getting "thrown out of the house" after petitioner was arrested, doing so would have only further drawn the jury's attention to the fact that, having made accusations of heinous abuse at the hands of her stepfather, C.D. was the one displaced from the family residence.

**b. Bolstering**

Hughes also argues that his trial counsel was ineffective for failing to object to the prosecution's elicitation of bolstering testimony from Child Protective Services ("CPS") caseworker Jennifer Mengel ("Caseworker Mengel") Lieutenant Edward Watson ("Lieutenant Watson"), and Sergeant Patrick Donlon ("Sergeant Donlon"). Petitioner argued on direct

appeal that these witnesses' "sole aim was to bolster and repeat statements and allegations" made by the victim to police.

The Third Department did not unreasonably apply clearly established Supreme Court precedent in rejecting this basis for Hughes's ineffective-assistance claim.  As the Third Department correctly noted, Caseworker Mengel's limited testimony regarding C.D.'s allegations—that petitioner abused her from age "ten till approximately eighth grade"—served to "describe the reaction of the victim's mother to [Caseworker Mengel's] report to her of [those] allegations."  *Hughes*, 114 A.D.3d at 1022.  Caseworker Mengel's testimony regarding C.D.'s allegations also gave context to the subsequent steps she took as part of her investigation, and her observations about the demeanor of petitioner's mother upon learning of the allegations were relevant to explain C.D.'s "apparent delay in disclosing the abuse."  *Id.* at 1023.

Moreover, this testimony was also relevant to C.D.'s decision to run away from home, which Hughes's trial counsel cast as C.D.'s attempt to avoid getting into trouble for disobeying his household rules.  The Third Department properly concluded that, even if Caseworker Mengel's testimony concerning C.D.'s allegations constituted bolstering, its admission was harmless because the prosecution did not rely upon that "brief" testimony as direct evidence of petitioner's guilt.  *Hughes*, 114 A.D.3d at 1023.  Given that the Third Department considered the merits of petitioner's bolstering argument with respect to Caseworker Mengel's testimony—and specifically rejected that argument—it cannot be said that defense counsel was ineffective for failing to "consistently object" to that testimony.

Turning to the testimony of Lieutenant Watson and Sergeant Donlon, the Third Department aptly characterized these witnesses's testimony as being "limited to a brief

15

repetition of the general allegation of sexual abuse made by the victim, without reference to any time frame or other details." *Hughes*, 114 A.D.3d at 1023.

In particular, Sergeant Donlon's testimony provided background information regarding his limited role in the preliminary stages of the investigation, including his brief interview of C.D. and his encounter with Hughes.  Sergeant Donlon testified that, on March 20, 2011, he was working as shift supervisor at the Watervliet Police Department when law enforcement from Green Island contacted him about a missing person—C.D.—who had been located. Sergeant Donlon directed another officer to transport C.D. to the Watervliet Police Department, and, while there, C.D. disclosed that petitioner had subjected her to physical and sexual abuse.  Later that day, after petitioner agreed to come to the police station to speak about C.D. (but before he was aware of the allegations made by her), Sergeant Donlon gave petitioner a ride to the station.

The prosecution limited its questioning to background information and repeatedly advised Sergeant Donlon that he should not testify as to "specifics about what [the victim] said."  Instead, Sergeant Donlon testified that C.D. stated she "wasn't exactly sure" regarding the time frame of alleged abuse, and that he had "concerns . . . that [C.D.] may be making this up" to avoid being disciplined at home.

Lieutenant Watson also provided background information, testifying, in part, that he interviewed the victim at the request of Sergeant Donlon.  Notably, Lieutenant Watson testified that C.D. was "unable to recall dates and times of . . . particular sexual assaults" except for the date of the first assault, and that he had "concerns" about the veracity of C.D.'s statements.

On cross-examination, defense counsel elicited testimony from Lieutenant Watson to

the effect that "a lot of information [the victim provided to him] just didn't flow" and he "[a]bsolutely" was skeptical of the information she provided to him; in fact, he advised her that making a false statement was a crime.  Defense counsel also elicited testimony that Lieutenant Watson "misled [petitioner's wife] about the nature and circumstances of what the allegations were," and did not tell her of the "potential punishments" in order for her to ask petitioner to come to the police station.

In short, rather than improperly bolstering the victim's account, Lieutenant Watson's and Sergeant Donlon's testimony merely served to provide background information and explain their subsequent actions in pursuing the investigation.  The Third Department did not unreasonably apply *Strickland* in rejecting petitioner's argument.

### 2.  **Failure to Argue a Violation of the *Ex Post Facto* Clause**

Hughes contends that his trial counsel was ineffective for failing to object and preserve "the *Ex Post Facto* violation contained [in] Count One of the Indictment - Predatory Sexual Assault Against a Child."  Petitioner argued on direct appeal that trial counsel rendered ineffective assistance because, among other things, he did not "raise an objection with respect to the *ex post facto* nature of the top count" of the indictment.

Hughes first advanced this *ex post facto* challenge in his post-trial motion to set aside the verdict.  The trial court found this argument unpreserved.  Later, the Third Department concluded that trial counsel's failure to raise this argument did not "deprive [Hughes] of meaningful representation" because (1) even if the court considered petitioner's unpreserved *ex post facto* claim, it "would find" that underlying claim "to be without merit," and (2) the totality of the circumstances–including counsel's "appropriate pretrial motions," "cogent"

17

opening statement and summation, "pursu[it of] a reasonable defense," and vigorous cross-examination of prosecution witnesses–demonstrated that petitioner received the effective assistance of counsel. *Hughes*, 114 A.D.3d at 1024-25.

As discussed in greater detail below, the Third Department reasonably concluded that the evidence was legally sufficient to support the predatory sexual assault conviction. Moreover (and as also discussed below), Hughes's *ex post facto* claim is barred and, in any event, lacking merit. Sufficient evidence supported the conclusion that petitioner committed the offense of predatory sexual assault against a child within the timeframe alleged (and thus, after the effective date of the Penal Law § 130.96). Accordingly, trial counsel was not ineffective for failing to challenge that count as violative the *Ex Post Facto* Clause.

"It is well settled that '[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance" to which a petitioner is entitled. *Parks v. Sheahan*, 104 F. Supp. 3d 271, 286 (E.D.N.Y. 2015) (holding that petitioner suffered no prejudice under the second prong of *Strickland* as a result of trial counsel's failure to preserve a meritless issue because the state court's outcome would not have been different).

Even if trial counsel had timely raised the *ex post facto* claim before the trial court, the Appellate Division would have properly rejected it on appeal. *See Hughes*, 114 A.D.3d at 1024 (noting that the claims contained in petitioner's post-trial motion to set aside the verdict were not preserved and, in any event, "the failure to raise these objections at trial" did not constitute ineffectiveness because the those claims were "without merit"). As a result, petitioner's argument provides no basis for habeas relief. *See Lawrence v. Graham*, No.

18

1:12-CV-0814, 2014 WL 585301, at *10 (W.D.N.Y. Feb. 13, 2014) (concluding that petitioner's *ex post facto* challenge "had little to no chance of success on the merits" and therefore he was not prejudiced by his trial counsel's failure to assert the claim).

### 3. <u>Failure to Object to the Scope of Expert Witness's Testimony</u>

Hughes contends that his trial counsel was ineffective for failing to object to the allegedly improper scope of the testimony given by the prosecution's expert, Dr. Richard M. Hamill, who testified regarding Child Sexual Abuse Accommodation Syndrome ("CSAAS").  Respondent argues this claim lacks merit.

At the outset, respondent acknowledges that Hughes argued on direct appeal that his trial counsel was ineffective for, among other things, failing to "object to the scope of the testimony presented by the People's expert witness."  However, whether petitioner properly exhausted that particular claim is less clear to the Court.  Although petitioner argued on direct appeal that he was deprived of a fair trial because the prosecution "improperly used" Dr. Hamill's testimony in order to draw similarities between the victim's behavior and behaviors consistent with the victims of sexual abuse, he did not specifically argue that counsel was ineffective for failing to object to that testimony.

Additionally, although Hughes argued conclusorily in his CPL § 440.10 motion that trial counsel "[f]ailed to object to the scope of the People's expert testifying on" CSAAS, that claim was plainly record-based and should have been raised on direct appeal.  *See* Clark, 510 F.3d at 392 ("[A] motion to vacate based on facts visible on the trial record must be dismissed where the defendant unjustifiably failed to raise the issue on direct appeal.").

In any event, however, Hughes's claim is plainly meritless.  Petitioner does not identify with specificity what questions posed by the prosecutor to Dr. Hamill to which trial counsel

purportedly should have objected, or what aspect of Dr. Hamill's testimony was

constitutionally improper.  The Third Department rejected petitioner's standalone claim that

Dr. Hamill's testimony should have been precluded, explaining that it

> is well settled that testimony to explain the range of behaviors of
> sexually abused children–including why they may delay in reporting
> sexual abuse–may be admitted as beyond the ordinary
> understanding of the average juror.  Here, the People's expert
> testified about these behaviors generally in an effort to counter
> negative inferences urged by defendant's counsel and did not
> attempt to impermissibly prove that the victim had been sexually
> abused.

*Hughes*, 114 A.D.3d at 1023-24 (citations omitted).

Hughes does not assert in this proceeding, as an independent ground for federal

habeas relief, that the Third Department unreasonably applied clearly established Supreme

Court precedent in concluding that Dr. Hamill's testimony was properly admitted, and a

review of the state court record does not suggest otherwise.

Testimony regarding CSAAS "is admissible as a matter of New York state evidentiary

law when it is relevant in a particular case."  *Miles v. Conway*, 739 F. Supp. 2d 324, 337

(W.D.N.Y. 2010) (finding that petitioner could not demonstrate that the trial court erred in

allowing expert testimony regarding CSAAS, and collecting cases).

The state court record provides no support for the proposition that trial counsel's

representation was deficient in this regard, or that petitioner suffered resulting

prejudice.  Trial counsel opposed the prosecution's pretrial motion in limine to introduce the

testimony of an expert on CSAAS to explain in general terms the behavior of abuse victims.

Moreover, Dr. Hamill's testimony at trial was limited to CSAAS in general.  On direct

examination, he explicitly stated he was not testifying with regard to whether C.D. was a

victim of sexual abuse.  During cross-examination, trial counsel elicited testimony reiterating that Dr. Hamill "knew very little about the specific factual allegations [in] this case," had never met the victim, had not reviewed any of "her documents" or "any notes," and was not testifying to offer an opinion as to whether or not petitioner was guilty.  Notably, petitioner also presented his own expert, Dr. Jacqueline Bashkoff, who testified regarding CSAAS in general.

Based upon the foregoing, even if it can be said that trial counsel "[f]ailed to object to the scope of" Dr. Hamill's testimony on CSAAS, the Third Department plainly considered, and found proper, Dr. Hamill's testimony in the context of the trial record.  There is no basis on which to conclude trial counsel's strategy with respect to countering the prosecution's expert was deficient, or that further objection to the expert's testimony would have swayed the state courts to reach a different conclusion.  Accordingly, this basis for petitioner's ineffective-assistance claim is lacking in merit.

### 4.  Failure to Interview and/or Call Certain Prospective Witnesses

Hughes contends that his trial counsel was ineffective for failing to interview, and/or call as trial, certain "critical witnesses" who would have established his innocence.  More specifically, petitioner argues that counsel unreasonably failed to investigate or call at trial the following prospective witnesses:  (1) petitioner's wife (C.D.'s mother); (2) Meghan Hughes (petitioner's sister); (3) Linda Hughes (petitioner's mother); and (4) Patrick "Rico" Hughes (petitioner's son).  Respondent argues the petitioner's claim is without merit because trial counsel was concerned about the credibility of petitioner's wife, and argues that petitioner failed to provide information to trial counsel regarding these individuals that would have necessitated interviews with those individuals.

21

While this action was stayed, Hughes raised this argument in a counseled

CPL § 440.10 motion.  In support of his motion, petitioner filed affidavits from each of the

witnesses at issue, and he attached the same affidavits to his original petition in this action.

The affidavits supplied by Hughes asserted, in essence, that petitioner could not, and would

not, have committed the acts alleged by C.D., who the affiants characterized as dishonest

and manipulative.  Petitioner's wife averred, *inter alia*, that (1) she was never interviewed by

trial counsel, (2) she never observed petitioner abusing the victim, (3) petitioner could not

have sexually assaulted the victim in the garage of their residence in the summer of 2006[2]

because (a) he "could not obtain an erection" when he was intoxicated, (b) the garage was

too cluttered to complete an assault there, (c) if petitioner were ever left home alone with the

victim, petitioner "would have been in bed drunk and asleep" and would not have had

sufficient time to assault the victim, and (4) petitioner could not have sexually assaulted the

victim in petitioner's camping trailer in the summer of 2009[3] because the camper was "small

and cramped" and offered no privacy.

Hughes's sister averred, *inter alia*, that (1) she "believe[s] that [petitioner] is innocent,"

(2) even if she and other family members left petitioner and the victim home alone on one

---

[2]  This incident was the basis for count one of the indictment, charging petitioner with predatory sexual assault against a child (Penal Law § 130.96).  C.D. testified at trial that, during the summer between her time in fifth grade and sixth grade, petitioner engaged in oral sex and sexual intercourse with her on the floor of the garage at the family's residence while other family members were out picking up food for dinner.

[3]  This incident was the basis for counts two and three of the indictment, charging petitioner with first degree rape by forcible compulsion (Penal Law § 130.35(1)) and second degree rape, based upon petitioner's age (i.e., more than eighteen years old) and C.D.'s age (i.e., less than fifteen years old) (Penal Law § 130.30(1)).  C.D. testified at trial that, during a trip to petitioner's camp (at which her mother was not present), petitioner offered her and her underage step-siblings alcohol and engaged in sexual intercourse with her on a small bed in the trailer.  In his sworn written statement following an interrogation by law enforcement officers, petitioner admitted that, during a weekend trip to the camp "[i]n July or August of 2009," he had sexual intercourse with C.D. while the other children were outdoors "playing flashlight tag[.]"  According to petitioner, this was the last occasion on which he "disciplined [C.D.] using intercourse."

occasion to purchase dinner, as the victim claimed happened preceding the summer 2006

incident, the family members returned home "no more than 15 minutes" later and petitioner

was drunk in bed, (3) the garage where that alleged sexual assault occurred had "junk all

over the floors," (4) the victim regularly lied "to get her way" and never reported being abused

before her allegations precipitating the prosecution, and (5) on one occasion in the past, the

victim stated that she was "going to come up with something that is going to put [petitioner] in

jail for the rest of his life."

Hughes's mother averred, *inter alia*, that (1) she did not live in the same house as

petitioner and the victim, (2) the victim never complained to her that petitioner was abusing

her, (3) the victim "would frequently lie, deceive and generally act out to try and get what she

wanted or to get her way with things," and (4) petitioner could not have assaulted the victim

at petitioner's camp because (a) petitioner told his mother that "he could not go to camp that

summer" due to "financial troubles" and (b) someone would have heard or seen the assault.

Finally, Hughes's son averred, *inter alia*, that (1) on the night of the alleged garage

assault in the summer of 2006, he, petitioner's wife, and petitioner's sister left the residence

for "no more than ten (10) minutes" to pick up dinner, (2) there was "no room at all for

anyone to lay down in the garage" due to "boxes, trash and other objects," (3) the family did

not go to the camp during the summer of 2009, (4) the victim had a reputation for lying, and

(5) petitioner "drank too much and he abused" his son, but could not have committed the

crimes charged.

The prosecution opposed Hughes's motion and filed as exhibits trial counsel's witness

list, which listed petitioner's wife as a potential witnesses along with an affidavit from

petitioner's trial counsel.  In his affidavit, trial counsel asserted that his "two-fold" strategy at

23

trial was to present (1) testimony that petitioner "was coerced to provide a false confession" and (2) expert testimony related to CSAAS, a "controversial and oft-litigated condition," for the purpose of "undermin[ing]" the victim's credibility.

Trial counsel averred that the affidavit proffered by Hughes's wife was "woefully inaccurate," particularly regarding "whether [he] interviewed" her. Counsel recalled that he met with petitioner on multiple occasions to discuss the case, that petitioner's wife was present and "actively engaged in" the discussion "at all of our meetings," and frequently asked questions, answered questions, "offered suggestions" on the defense, and "often commented on the evidence against" petitioner. Petitioner's wife "believed that . . . the victim was lying" and, according to counsel, "fully supported [his] defense strategy." Additionally, counsel averred that he had over "sixteen telephone conferences with" petitioner, and that petitioner's wife was "on speaker phone actively participating in" "[m]any of" those conversations.

Counsel asserted that he "at one point . . . contemplated" calling Hughes's wife as a witness at trial, but, based on his many interactions with her, "made the strategic decision" not to call her. He had "concerns about her appearance of credibility to the jury" because she "did not appear candid as to many of the important issues regarding" petitioner's case, and "had an excuse for each piece of evidence against him[.]"

On the prosecution's direct case, C.D. testified that she had, "very early on," disclosed Hughes's abuse to her mother, who had "minimized the seriousness of the abuse" and "discouraged" C.D. from reporting it to anyone else.[4]  Counsel "[f]ear[ed] that" C.D.'s account

---

[4]  C.D. testified at trial that, before the date of petitioner's arrest, she had disclosed the abuse she had suffered to her mother, but that petitioner continued to live in the same residence and the abuse continued.

would place C.D.'s "credibility directly at odds with" that of her mother, "or worse, require" her mother to answer questions on cross-examination about that conversation.

With respect to C.D.'s credibility, trial counsel averred that, during his investigation, "several instances" of C.D.'s "deceitful behavior" and "fabrication of minute details became known to" him. Nevertheless, counsel decided to present this evidence only through cross-examination, due to his concern that the prosecution's "countervailing theory that the victim's overall behavior was due to her being a victim of abuse," a prospect to which he "did not want to draw the jury's attention[.]"

Counsel asserted that he also "invited [Hughes] and [his wife] to provide insight into the family dynamic, the background of camp in the Town of Berne, and the overall behavior of the victim." At no point did petitioner or his wife "mention any of the information sworn to in the affidavits" proffered by petitioner in support of his motion.

Finally, counsel noted that he had also interviewed C.D.'s "Aunt Faith and Uncle Tim" prior to trial. Contrary to the assertions of Hughes and his wife, however, counsel found that these prospective witnesses "could provide no meaningful testimony" on petitioner's behalf, and what little they could provide "would drastically undermine the theory of [petitioner's] defense[.]"

The Albany County Supreme Court rejected Hughes's argument, explaining as follows:

> Without submitting any affidavit from trial counsel or explaining the lack thereof, defendant has submitted affidavits from family members who did not testify at trial and asserts that trial counsel failed to properly investigate issues and without any good or strategic reason failed to call these people as witnesses. However, the list of potential witnesses makes it clear that defense counsel did consider calling defendant's wife as a witness but elected not to do

so.  Furthermore, defense counsel has refuted defendant's current claims concerning defense counsel not having interviewed defendant's wife in an effort to determine if her testimony would be helpful to him.  It is noted that two children who lived in the house with defendant did testify for the prosecution at trial.  These witnesses corroborated the victim's account of various incidents.

. . .

Defendant has failed to meet his burden of establishing any absence of strategic or other legitimate explanations for defense counsel's representation at trial.  At trial, defense counsel attacked the credibility of the victim and the police actions in obtaining defendant's statement, vigorously cross-examined the prosecution witnesses and presented an expert to refute the conclusions of the prosecution expert.  The prosecutor has submitted an affidavit from defense counsel detailing his numerous contacts with defendant's wife and defense counsel's concerns about the wife's credibility. The court record indicates that, in listing defendant's wife as a potential witness, defense counsel had clearly considered calling [her] as a witness but, in the end, did not call her.  The record thus supports the statements made by defense counsel in his affidavit such that it is not simply a matter of defendant saying one thing and defense counsel, without support in the record, saying another. Defense counsel's vigorous defense evinced a reasonable defense strategy. Defendant's present attempt to characterize it as otherwise and to submit statements from persons who were not present when the crime occurred, and which do not offer an alibi, are insufficient to establish, or even suggest, ineffectiveness.  It is noted that in making a statement to the police, defendant mentioned various details which the police had not told him about when they explained what the victim had reported to them.  These details supplied by defendant supported the credibility of the allegations.  The statements in the affidavits, by family members who were not present during the two charged crimes, are insufficient to overcome this proof or to require a hearing on any material fact.  Clearly, defense counsel was well prepared to try this case and exerted significant effort on defendant's behalf.  Defendant has not made a sufficient showing that there was any lack of strategic explanation for defense counsel's course of action.

The state court reasonably concluded trial counsel was not ineffective for refraining

from calling Hughes's wife as a witness or from interviewing the other individuals identified by

petitioner. Regarding petitioner's wife, as the § 440.10 court found, trial counsel stated in his affidavit that he conducted several in-person and telephone meetings with petitioner for which petitioner's wife was present, invited petitioner's wife to provide certain information, and listed petitioner's wife on the witness list. Trial counsel stated he ultimately made a "strategic decision" not to call her as a witness due to credibility concerns.

Regarding the other individuals, trial counsel stated that prior to trial, he "thoroughly discussed his trial strategy and defense" with Hughes and his wife and "[a]t no point did [petitioner] or [petitioner's wife] mention any of the information sworn to in the affidavits" provided by these individuals. In any event, the state court reasonably concluded that petitioner's claim was without merit, noting the "statements in the affidavits . . . [from individuals] who were not present during the two charged crimes, are insufficient to overcome this proof or to require a hearing on any material fact."

The decision "regarding whether to call witnesses on behalf of a defendant, and, if so, which witnesses to call, is a tactical decision that generally should not be disturbed on habeas review." *Baptiste v. Ercole*, 766 F. Supp. 2d 339, 363 (N.D.N.Y. 2011) (McAvoy, J.) (denying petitioner's claim that trial counsel was ineffective for failing to call exculpatory witnesses where the petitioner set forth a vague and conclusory statement) (citing *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.")); *see also Schulz v. Marshall*, 528 F. Supp. 2d 77, 92-93 (E.D.N.Y. 2007) (noting that, "[w]ith respect to alibi witnesses in particular, courts have found that even if . . . alibi evidence did exist, the trial attorney's decision not to call the purported alibi witnesses was a tactical decision that does not constitute deficient performance") (citation and quotation marks

27

omitted)*, aff'd,* 345 Fed. Appx. 627 (2d Cir. 2009) .

The record in this case strongly supports the conclusion that trial counsel pursued a reasonable strategy in executing Hughes's defense based on the information available to him.  It therefore cannot be said that the state court unreasonably applied clearly established Supreme Court precedent or unreasonably determined the facts.  Habeas relief is thus unwarranted on this basis.

### 5. Failure to Investigate Potential Alibis

Hughes argues that his trial counsel was ineffective for failing to adequately investigate potential alibis which would have demonstrated that he did not visit his camp in the summer of 2009.  Petitioner contends trial counsel "could have sought corroborating testimony from [p]etitioner's family *and* could have presented objective, corroborating documentation in the form of financial records as circumstantial evidence that [p]etitioner never went to Berne, New York in the summer of 2009 because of financial difficulty."

The Albany County Supreme Court reasonably rejected this claim.  Among other things, the trial noted that the individuals who submitted affidavits "were not present when the crimes occurred[.]"  Moreover, the trail court observed that petitioner's trial counsel asserted that he "thoroughly discussed his trial strategy and defense, including [petitioner's] testimony," with petitioner and his wife, and expressly "invited" them to provide information regarding "the background of camp in the Town of Berne[.]"

The state court credited trial counsel's assertion that they did not provide the information referenced in the affidavits submitted by Hughes, and this Court finds no basis

28

for upsetting that determination.[5] *See Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) ("Where [r]easonable minds reviewing the record might disagree as to the relevant finding, that is not sufficient to supplant the state court's factual determination.") (internal quotation marks omitted).  In any event, as respondent notes, it is not clear how petitioner's financial difficulties would have established that he did not visit the camp in the summer of 2009, and counsel reasonably pursued the theory that no sexual encounter ever took place rather than focusing on the specific date of the alleged incident.

### 6.  Failure to Present Certain Other Evidence

Hughes contends that his trial counsel was ineffective for failing to present "strong evidence rebutting many of the charges" and for failing to "meaningfully attack" the victim's credibility.  Petitioner appears to refer to the following as the purported evidence:  (1) testimony and affidavits from "character witnesses," who allegedly could have impeached the victim; (2) "notes from CPS which indicate the [victim] was regularly considered untruthful and manipulative;" and (3) photographs of locations where incidents occurred.

The record supports the state court's observations that trial counsel "attacked" the victim's credibility, presented a "vigorous defense," and "evinced a reasonable defense strategy."  Trial counsel challenged the victim's credibility during his opening statement, elicited testimony from the victim that she was untruthful at times, and questioned the victim's credibility during his summation by noting the victim was untruthful, had a motive to lie, and provided few details about the extensive abuse that she was alleging.

As noted above, Hughes's wife, sister, mother, and son averred that C.D. was

---

[5]  It does not appear that petitioner filed any financial records in support of his "alibi" on his motion to vacate the judgment in state court.

untruthful.[6]  However, trial counsel explained that he made a "strategic decision" to highlight the victim's purported dishonesty primarily through cross-examination because he "did not want to draw the jury's attention" to the prosecution's "countervailing theory" that the victim was dishonest or deceitful as a result of the abuse she suffered.

That strategy was not an unreasonable one.  "The decision to call, or not call, a witness is a classic example of trial strategy," and the decision of "whether to call a specific witness–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation.'"  *Moore v. Kirkpatrick*, No. 09-CV-0457, 2011 WL 1233124, at *14 (W.D.N.Y. Mar. 30, 2011) (citing *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)).  Here, trial counsel made strategic decisions to refrain from calling certain witnesses, including witnesses to statements unrelated to the incidents at issue.  The state court reasonably found that this decision did not constitute ineffective assistance.

Regarding the CPS notes, Hughes filed certain "Family Services Progress Notes," documenting conversations case workers had in 2011 with the victim and/or the victim's aunt (with whom the victim resided after petitioner posted bail).  However, the incidents in question here occurred from 2006 to 2009, and thus, these hearsay accounts of certain of the victim's statements shed little light on the truthfulness of her statements regarding the abuse, which occurred multiple years earlier.

Additionally, to the extent that Hughes contends that the victim's "Aunt Faith and Uncle Tim" would have, "upon information and belief," testified that the victim "threatened to

---

[6]  These proposed witnesses' affidavits were not sworn to until July 2015, approximately one week before petitioner filed his original habeas petition and over three years after he was convicted.  Calling these witnesses at trial would have also exposed them to cross-examination, and, as trial counsel asserted, this may have resulted in the victim's mother being questioned on C.D.'s earlier disclosures of abuse.

make false allegations of abuse" against them, that contention is unsupported by any record evidence, such as affidavits from those prospective witnesses detailing when this statement purportedly occurred.  *See Moore*, 2011 WL 1233124, at *14 ("With respect to the remaining individuals, Petitioner has failed to provide affidavits or declarations from any of them showing what their testimony would have been."); *Schulz*, 528 F. Supp. 2d at 96 n.13 ("In evaluating claims of ineffective assistance of counsel based on failure to investigate witnesses, courts place weight on a defendant's ability to show that these witnesses would have had helpful information.")   Moreover, trial counsel averred that he interviewed these individuals and elected not to call them at trial because their limited testimony would have undermined his defense.

Finally, Hughes argues that defense counsel should have introduced certain photographs that would have "corroborated" his statements and the potential statements of other individuals that the alleged assaults did not occur in the locations in question because, in the garage, there was "no room for the assault to occur;" and in the camping trailer, there were no "doors or barriers" separating petitioner and the victim from another individual.

However, the offenses occurred from 2006 to 2009, Hughes was charged in 2011, and the photographs of the trailer were taken in 2015.  The photographs of the trailer also do not appear to seriously undermine C.D.'s trial testimony, which was that the encounter occurred on the bed in the trailer, outside the presence of the other children, and lasted only a brief time.  Similarly, counsel could have reasonably concluded that photographs of the garage, merely depicting its messiness, would not have been a persuasive strategy for countering C.D.'s allegation that petitioner assaulted her there.  The state courts' conclusion regarding counsel's performance did not constitute an unreasonable application of *Strickland*.

### 7. <u>Failure to Investigate Petitioner's Medical Condition</u>

Hughes argues that his trial counsel was ineffective for failing to investigate his medical condition.  Specifically, petitioner claims that he suffered from erectile dysfunction during the time of the incidents and that this condition would have precluded him from committing the offenses.  He contends that trial counsel should have obtained his medical records and interviewed his wife regarding his condition.

In rejecting this claim, the Albany County Supreme Court concluded that trial counsel contemplated calling Hughes's wife as a witness at trial and "refuted [petitioner's] current claims" that he failed to interview his wife to determine if her testimony would be helpful to the defense.  The affidavit from Hughes's wife, which was prepared after petitioner was convicted, asserts that he "could not obtain an erection" when he was "heavily intoxicated."  However, the affidavit does not establish that petitioner was diagnosed as suffering from erectile dysfunction, and the trial evidence supported the conclusion that petitioner's wife was not present during the trip to the camp at issue or the assault in the garage.

Moreover, Hughes has not alleged, much less shown, that he provided this information or medical records to trial counsel during any of their numerous meetings, and counsel asserted that neither petitioner nor his wife advised him of any of the matters set forth in his wife's affidavit.  Accordingly, the state court reasonably determined trial counsel was not ineffective in this regard.

### 8. <u>Failure to Present an Expert Witness Regarding False Confessions</u>

Hughes argues that his trial counsel was ineffective for pursuing the strategy of "claiming a coerced confession" without consulting with, or calling as a witness, an expert on

32

the subject of false confessions.  Petitioner claims his confession was a result of interrogation techniques that were "overwhelmingly deceptive and coercive," and which a typical juror "would not understand . . . without expert assistance."

There is no basis on which to conclude that the state court unreasonably rejected this claim.  As an initial matter, Hughes has not established that testimony from a false confessions expert would have been admissible under New York law at the time of his trial.  New York courts have long rejected attempts by defense counsel to call a false confessions expert and found that the failure to call such an expert does not amount to ineffective assistance of counsel.  *See, e.g.,Curry v. Burge*, No. 03-CV-0901, 2007 WL 3097165, at *18 n.25 (S.D.N.Y. Oct. 23, 2007) (collecting cases), *adopted*, 2007 WL 4098115 (S.D.N.Y. Nov. 16, 2007); *Wiggins v. Ercole*, No. 1:08-CV-3053, 2011 WL 4526138, at *8 (S.D.N.Y. Aug. 5, 2011) (holding that "the law on the admissibility of false confession expert testimony was at best unsettled, such that the § 440 court's ruling was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement") (internal quotation marks and footnote omitted), *adopted*, 2011 WL 4502082 (S.D.N.Y. Sept. 29, 2011).

Hughes presents no evidence supporting his contention other than an article from 2008 pertaining to false confessions.  Petitioner has not established that the New York courts would have allowed false confession expert testimony at the time of his trial, or, in any event that such testimony was required for trial counsel to have reasonably pursued his trial strategy.

On March 29, 2012, approximately three weeks after the jury rendered its verdict in Hughes's criminal trial, the New York Court of Appeals "for the first time . . . considered the

admissibility of expert testimony on the subject of false confessions." *People v. Jeremiah*, 147 A.D.3d 1199, 1204 (3d Dep't 2017), *lv. denied*, 29 N.Y.3d 1031, 1033 (2017) (citing *People v. Bedessie*, 19 N.Y.3d 147, 161 (2012)).

In *Bedessie*, the Court "held that expert testimony on the personality and situational factors associated with false confessions may be helpful to a jury in a proper case, but is admissible only upon a showing that the proposed testimony is 'relevant to the defendant and interrogation before the court.'" *Jeremiah*, 147 A.D.3d at 1204-05 (quoting *Bedessie*, 19 N.Y.3d at 161).

Since the Court of Appeals' opinion in *Bedessie*, New York courts "have analyzed the relevancy of such proposed expert testimony based upon 'the nature of the interrogation, the applicability of the science of false confessions to the defendant and the extent to which the People's case relie[s] on the confession[.]'" *Id.* at 1205.

Hughes's submissions here do not clearly identify the proposed expert testimony that would have been offered, and deemed both relevant and properly admissible at the time of trial, much less that trial counsel was deficient in failing to seek to obtain such evidence. Rather, he appears to contend that he admitted to raping the victim because, according to his family members, he is "shy" and "does not handle conflict or stress well."

It is noted that the video recording of the entirety of Hughes's interrogation and creation of a written statement–including the time during which the interrogation room was empty because petitioner was given a break to go outside and smoke a cigarette with his wife–was slightly over two and a half hours. Having reviewed the state court records, including the videotaped interview in its entirety, this Court cannot conclude that the state courts' holdings constitute an unreasonable application of clearly established Supreme Court

34

precedent.  Therefore, habeas relief on this basis is unwarranted.

**B.  Ineffective Assistance of Appellate Counsel**

Hughes argues that his appellate counsel was ineffective for failing to argue on direct appeal that his confession to the police was obtained in violation of his Fifth Amendment rights.  Respondent argues the Appellate Division reasonably rejected petitioner's claim.

In his coram nobis application, Hughes contended that appellate counsel was ineffective for failing to appeal the trial court's denial of his motion to suppress his confession.  More particularly, petitioner argued that (1) he had no prior criminal history, (2) the interrogating officer "postur[ed] himself as a more lenient arbiter of the allegations than" the "women" from Child Protective Services, (3) the officer's "promise[s]" that his statements "would not be used against him" and "would not become public" served to "defeat[] the *Miranda* warnings" issued at the outset of the interrogation, (4) the officer gave him false "assurances of leniency" and told him that he could return home the same day, and (5) the officer confronted petitioner with "false forensic evidence" in the form of C.D.'s underwear.  Based upon the strength of this argument, petitioner reasoned, appellate counsel was ineffective in failing to raise it on direct appeal.  The Third Department summarily denied petitioner's coram nobis application.

The *Strickland* test applies to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Smith v. Murray*, 477 U.S. 527, 535-36 (1986).  To prevail, a petitioner must demonstrate that (1) "his counsel was objectively unreasonable in failing to find arguable issues on appeal" and (2) "a reasonable probability that, but for his counsel's unreasonable failure to" raise an issue on appeal, "he would have prevailed on his appeal."  *Robbins*, 528 U.S. at 259 (citation omitted).

35

In other words, "[t]o establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that [his] claim would have been successful before the [state's highest court]." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (quoting *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).

"A petitioner must show more than counsel's failure to raise a non-frivolous argument, because counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments, and is not required to advance every argument urged by the petitioner." *Hines v. Stallone*, 9:16-CV-1078 (TJM), 2017 WL 445387, at *9 (N.D.N.Y. Feb. 1, 2017) (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985), and *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

Viewed through the "doubly" deferential standard applicable to ineffective assistance claims on habeas review, there is no indication that the Third Department's rejection of Hughes's claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or that it was an unreasonable determination of the facts in light of the evidence presented. *Richter*, 562 U.S. at 105; *accord, Knowles*, 556 U.S. at 123.

In his seventy-plus page brief, appellate counsel provided a thorough statement of the facts adduced at trial and pressed numerous nonfrivolous arguments, including his contentions that the introduction of certain testimony deprived Hughes of a fair trial, the evidence was legally insufficient and the verdict was against the weight of the evidence, and trial counsel was ineffective.

In so doing, appellate counsel reviewed in detail Lieutenant Watson's interrogation of Hughes. Counsel argued that Lieutenant Watson employed "deception and trickery" by falsely claiming that semen was found on a pair of C.D.'s underwear, by telling petitioner that

36

he could "go home" if he "sa[id] that he did it," and arguing that petitioner "never unequivocally confessed[.]"  Moreover, as part of his contention that the verdict was against the weight of the evidence, appellate counsel argued that petitioner's admissions "were all equivocal" and resulted from law enforcement "overreach, manipulation and fear-tactics."

As part of its review of Hughes's weight-of-the-evidence claim, the Third Department explained that

> [t]he video recording of his interview with the police makes clear that he was not coerced and it belies his characterization of his admissions as equivocal and unreliable.  While he initially denied the allegations during the interview and then claimed that he had had a drinking problem that prevented him from remembering anything, he soon admitted to oral sexual conduct and sexual intercourse with the victim and described it as a way of disciplining her.  Significantly, he provided his interviewers with telling details concerning occasions and locations that they had not previously disclosed to him during the course of the interview. . . . Defendant also testified on his own behalf, but the jury rejected his denial that any of the previously admitted conduct had actually occurred and his improbable claim that he had merely told police what they wanted to hear in the confused hope that they would release him and then vindicate him after further investigation.

*Hughes*, 114 A.D.3d at 1022.

Thus, while appellate counsel did not expressly argue that evidence of Hughes's admissions should have been precluded on constitutional grounds, he concisely and zealously addressed the manner in which petitioner's statements were obtained as part of his argument that the weight of the evidence supported acquittal.  The Third Department's holding to the contrary, including its express reference to the full, videotaped interrogation, strongly suggests that petitioner would not have prevailed on that argument even if appellate counsel had briefed it.  *Smith*, 528 U.S. at 285.

Notably, the "ultimate issue of voluntariness [of a confession] is a legal question

requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)).  "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) (citing, *inter alia*, *Mincey v. Arizona*, 437 U.S. 385, 401 (1978)).

As a general matter, "a finding that police misconduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary[.]" *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018).  Courts weighing the voluntariness of a statement should consider such circumstances as "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green*, 850 F.2d at 901-02; *accord, Haak*, 884 F.3d at 409.

However, "vague promises of leniency for cooperation . . . generally will not, without more, warrant a finding of coercion." *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002); *accord, United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

Nothing in the state court records suggests that the Third Department unreasonably applied clearly established Supreme Court precedent or unreasonably determined the facts in light of the evidence presented.  Both the transcript of the interrogation filed by Hughes and the video recording of the interrogation, which was played for the jury at trial, support the conclusion that petitioner's statements were voluntarily made after *Miranda* warnings were provided.  While Lieutenant Watson did convey to petitioner that "there is a range of things

38

that happen to people [he] see[s]," including that some "get probation," "some go to jail," and "most of the time we send people out to get help" and "go to classes and stuff like that," he never assured petitioner of any particular outcome to the investigation.[7]

Additionally, Lieutenant Watson showed Hughes a pair of underwear purportedly saved by C.D. after a sexual encounter and asserted that semen was discovered on them. In actuality, C.D. had the underwear in her possession when she was located by law enforcement after running away, and had not saved them after an earlier incident. Lieutenant Watson testified at trial that this assertion to petitioner was false, and that he had no means of testing, at the police station, whether semen was present on the underwear.

However, Lieutenant Watson did not assert to Hughes that he knew petitioner to be the source of the fabricated semen; in fact, he advised petitioner that he could not test the underwear to determine its source. Under the circumstances, neither the recorded interrogation nor the trial testimony of the witnesses supports the proposition that petitioner's will was overborne by any deceptive tactics employed by the police officers.[8] *Green*, 850 F.2d at 900.

In sum, appellate counsel's decision not to challenge the voluntariness of Hughes's admissions on direct appeal was a matter of reasonable strategy in the selection of

---

[7] It appears that the transcript of the recorded interrogation, filed by petitioner as an exhibit to his petition, was created for this proceeding. In any event, the Court has reviewed both the transcript and the video recording, which was filed by respondent.

[8] A review of the interrogation recording reveals that, moments after being confronted with the underwear by Watson, petitioner acknowledged that it was "possible" that an encounter with C.D. could have occurred, but that he did not recall it due to his alcohol consumption during that timeframe. A short time later, after having responded to several of Watson's questions by saying that he was unable to remember any specific incidents, petitioner provided details consistent with C.D.'s account of the sexual assault in the garage, including that it occurred on a blanket and that he was positioned on top of C.D. Watson's claim that the underwear bore semen from an unidentified source was a deceptive tactic. However, the use of that tactic, when viewed against the nature of the interrogation as a whole and its relatively short length, did not render petitioner's subsequent admissions involuntary.

arguments to pursue, rather than a deficiency in performance.  Moreover, neither the state

court record nor the Third Department's observation, in discussing the weight of the

evidence, that petitioner was "clear[ly] . . . not coerced" suggest that, had appellate counsel

advanced this argument, he would have prevailed.  Accordingly, the Third Department's

denial of petitioner's coram nobis motion does not warrant habeas relief, and petitioner's

claim is therefore denied.

### C.  <u>Involuntary Confession</u>

Hughes contends, as an independent basis for habeas relief, that his rights under the

Fifth Amendment were violated because his statement to law enforcement officers was

induced by promises of leniency, "overbearing interrogation tactics," and statements that

"vitiated" his *Miranda* warnings.

Hughes's claim that his confession was involuntarily induced is unexhausted because

he failed to brief that claim on direct appeal to the Third Department.  His claim is also

procedurally defaulted because he cannot now return to state court and pursue a second

direct appeal to exhaust it.  *Aparicio*, 269 F.3d at 91.  The facts that would support this claim

were apparent on the record, and "New York does not otherwise permit collateral attacks on

a conviction when the defendant unjustifiably failed to raise the issue on direct appeal."  *Id.* at

91 (citing CPL § 440.10(2)(c)); *see also Clark,* 510 F.3d at 393.

Hughes's claim is therefore barred from review unless he can show cause for the

default and actual resulting prejudice, or that the denial of habeas relief would result in a

fundamental miscarriage of justice, i.e., that he or she is actually innocent.  *House*, 547 U.S.

at 536-39; *Schlup*, 513 U.S. at 327.

Hughes appears to argue that appellate counsel's failure to brief this argument on

appeal constitutes cause for the procedural default, and, as discussed above, this action was stayed while he litigated his coram nobis motion in state court.

However, as was also explained above, the Third Department did not unreasonably apply clearly established Supreme Court precedent or act unreasonably in determining the facts in denying Hughes's coram nobis application. Petitioner has not established that appellate counsel was ineffective in failing to argue that his statements were coerced or involuntary.

As a result, Hughes has not demonstrated cause sufficient to excuse his procedural default of his standalone Fifth Amendment claim. *See Aparicio*, 269 F.3d at 91 ("A defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel."); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution."); *Baptiste*, 766 F. Supp. 2d at 365 ("As discussed elsewhere in this Decision and Order, Petitioner's claim that appellate counsel was ineffective is without merit. It therefore may not serve as 'cause' for a procedural default."). Because petitioner has not established cause, the Court need not reach the issue of whether he established prejudice. *Murray*, 477 U.S. at 496; *Stepney*, 760 F.2d at 45.

Finally, there is no basis on which to conclude that the failure to consider the merits of this claim would result in a fundamental miscarriage of justice. *House*, 547 U.S. at 536-39; *Schlup*, 513 U.S. at 327. As discussed above, Hughes appended to his petition the affidavits of various family members, attesting to their beliefs that the victim was dishonest in character

41

and petitioner would not and/or could not have committed the crimes of conviction.

After carefully considering their content, these affidavits do not constitute "new reliable evidence" sufficient to establish that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329; *accord*, *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) ("To satisfy the *Schlup* standard, a claim of actual innocence must be both 'credible' and 'compelling.'"); *see also, e.g., Colon v. Sheahan*, No. 1:13-CV-6744, 2016 WL 3919643, at *16-17 (S.D.N.Y. Jan. 13, 2016) (concluding that affidavits from "potential witnesses," including petitioner's parents and friends, were "not sufficient to shoulder the *Schlup* burden" because they included "no supporting proof, documentary or otherwise," were not from "disinterested" witnesses, and were insufficiently detailed and not probative of petitioner's whereabouts at the time of the crime), *adopted*, 2016 WL 3926443, at *7 (S.D.N.Y. July 14, 2016); *Philbert v. Brown*, No. 1:11-CV-1805, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) (rejecting claim of actual innocence to overcome procedural default, where new evidence consisted of affidavits from petitioner's "girlfriend and his girlfriend's mother," and one such affidavit "state[d] only a belief, as opposed to actual knowledge," as to petitioner's whereabouts at the time of the crime); *Desrosiers v. Phillips*, No. 1:05-CV-2941, 2006 WL 2092481, at *8 (E.D.N.Y. July 27, 2006) ("Generally, . . . exculpatory affidavits [from friends] do not establish actual innocence, as they are not reliable.").

The affidavits proffered by Hughes's wife, sister, brother, and son, while reflective of those witnesses' disbelief of the victim's allegations, are neither "credible" nor "compelling" within the meaning of the *Schlup* actual-innocence gateway standard. *Rivas*, 687 F.3d at 541. The affidavits all come from witnesses who cannot fairly be characterized as

disinterested and who were admittedly not present during the incidents alleged.

While the content of the affidavits may in part amount to evidence calling into question the victim's version of events, they "fall[] far short of the . . . miscarriage of justice exception," which is "reserved 'for a narrow class of cases, where 'actual innocence' means factual innocence, not mere legal insufficiency.'" *Eduardo v. Smith*, No. 1:10-CV-0622, 2010 WL 5584599, at *5 (S.D.N.Y. Jan. 11, 2010) (quoting *Schlup*, 513 U.S. at 315, and *Bousley*, 523 U.S. at 623). For the foregoing reasons, Hughes's claim is procedurally defaulted and thus barred from habeas review.

### D.  Legal Sufficiency and *Ex Post Facto* Violation Regarding Count One

Hughes contends that his conviction for predatory sexual assault against a child (Penal Law § 130.96) was based upon legally insufficient evidence and violated the Ex Post Facto Clause. More particularly, petitioner argues that the evidence was insufficient "to prove beyond a reasonable doubt" that the acts underlying the conviction occurred after the effective date of the statute (June 23, 2006). Because the charge is a class A-II felony and thus "significantly increased [his] exposure" compared to a first degree rape charge (which is a class B felony), petitioner reasons, a more onerous punishment was imposed based on conduct that may have occurred before the statute went into effect.

### 1.  Legal Sufficiency of the Evidence Regarding Count One

Evidence is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker*, 567 U.S. at 43 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

This inquiry "does not focus on whether the trier of fact made the *correct* guilt or

43

innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson*, 443 U.S. at 319.

The Supreme Court has explained that its decision in *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 326)).

A legal sufficiency claim on federal habeas review is "doubly deferential" because, as discussed above, "a federal court may not grant the writ of habeas corpus unless the state courts' decision [rejecting the sufficiency claim] was based on 'an unreasonable application of . . . clearly established Federal law.'" *Garbutt v. Conway*, 668 F.3d 78, 81 (2d Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)).

Thus, where the state courts have denied on the merits a petitioner's legal sufficiency claim, a district court "may not grant the writ unless [it] conclude[s] that *no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt*, 668 F.3d at 82.

Finally, as previously noted, section "2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

To sustain Hughes's conviction for predatory sexual assault against a child, the prosecution was required to prove that petitioner, "being eighteen years old or more,"

44

committed the crime of first degree rape and, at the time, C.D. was "less than thirteen years old."  Penal Law § 130.96; *see* Penal Law § 130.35(4) (providing that a person is guilty of first degree rape when he or she "engages in sexual intercourse with another person . . . [w]ho is less than thirteen years old and the actor is eighteen years old or more").  That statute was effective as of June 23, 2006.  *Id.*

Count one of the indictment charged Hughes with predatory sexual assault against a child, alleging that petitioner, "on or about and in between June 23, 2006 and September 6, 2006, at 1219 19th Street in the City of Watervliet . . . being eighteen years old or more, did engage in sexual intercourse with a [C.D.], whose date of birth was" in September 1994.  The only element petitioner challenges in his sufficiency claim is that the offense occurred on or after June 23, 2006.  Petitioner contends that the trial evidence did not establish the date of the offense, and "the first day of summer that year was June 21, 2006."

On direct appeal, the Third Department rejected this sufficiency claim.  The appellate court noted that "[t]he victim testified that the first incident of sexual intercourse occurred in the summer before she started sixth grade, which was shown to be during the time period charged and thereby established when the sexual intercourse was alleged to have occurred."  *Hughes*, 114 A.D.3d at 1021-22.

The Third Department did not unreasonably apply clearly established Supreme Court precedent in rejecting this argument.  C.D. testified that Hughes engaged in sexual intercourse with her for the first time during an encounter in the garage of the family's residence during the summer of 2006, which was the summer between the time she

45

concluded fifth grade and the time she started sixth grade.[9]

On cross-examination, Hughes testified that C.D.'s summer break between the fifth grade and sixth grade began near the end of June 2006.  From this testimony, a rational trier of fact could—and evidently did—find that the alleged assault occurred within the timeframe alleged in the indictment.  Accordingly, petitioner cannot establish that "*no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt."  *Garbutt*, 668 F.3d at 82.

### 2. *Ex Post Facto* Clause Violation

To the extent that Hughes contends that his conviction for predatory sexual assault against a child violated the *Ex Post Facto* Clause, this claim is procedurally barred because the Third Department relied upon an adequate and independent state ground to deny it.

The Third Department concluded that Hughes's "remaining arguments"; i.e., those that it did not otherwise expressly address, and which were raised for the first time in petitioner's posttrial motion pursuant to CPL § 330.30, were not preserved for review.  *Hughes*, 114 A.D.3d at 1024 (citing CPL § 470.05(2)).

Plainly among those "remaining arguments" was Hughes's *ex post facto* argument, which he pressed in his CPL § 330.30 motion and raised again on direct appeal.  The Third Department also concluded that, "[i]n any event, were we to address them, we would find

---

[9]  In his written statement following his interview with members of the Watervliet Police Department, petitioner asserted that he engaged in sexual intercourse with C.D. on the floor of the garage.  Although petitioner referred to this incident as having occurred in June 2008, he acknowledged that he was unsure of "the exact time or day" and his recollection of the other details of the encounter were consistent with petitioner's account.  During the videotaped interview preceding his written statement, petitioner spontaneously recalled that the encounter in the garage occurred on blankets spread on the ground, as well as the fact that he was positioned on top of C.D.  C.D. testified consistently with those details.  The Court notes that petitioner was charged with respect to, and C.D. testified about, a single incident that took place in the garage.

them to be without merit," and "[a]ccordingly, the failure to raise these objections at trial did

not deprive [petitioner] of meaningful representation[.]"

Substantive review of a habeas claim is prohibited if the state court rested its decision

on "a state law ground that is independent of the federal question and adequate to support

the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler,* 558

U.S. 53, 55 (2009)); *accord, Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

To qualify as an "adequate" ground, the state rule must be "firmly established and

regularly followed."  *Walker*, 562 U.S. at 316 (internal quotation marks omitted); *Downs v.

Lape*, 657 F.3d 97, 101 (2d Cir. 2011) (explaining that habeas review of a state court's

application of its own rules is deferential and is focused on whether the challenged ruling

"falls within the state's usual practice and is justified by legitimate state interests, not whether

the state court ruling was correct.").  A rule can be firmly established and regularly followed

"even if the appropriate exercise of discretion may permit consideration of a federal claim in

some cases but not others."  *Kindler*, 558 U.S. at 61.

Even if the state court considers the merits of an otherwise precluded claim, its

reliance on a procedural ground as one basis for the denial of the claim precludes federal

habeas review.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (noting that "a state court

need not fear reaching the merits of a federal claim in an *alternate* holding" because "the

adequate and independent state ground doctrine requires the federal court to honor a state

holding that is a sufficient basis for the state court's judgment, even when the state court also

relies on federal law") (emphasis in original); *Fulton v. Graham*, 802 F.3d 257, 265 (2d Cir.

2015) (finding that the state court's discussion of ineffective assistance claim, introduced by

noting that "*if this court were to consider* the defendant's claim of ineffective assistance of

counsel, the motion *would* similarly be denied" signaled that the court "was *not* basing its judgment on the merits of the federal claim, but rather on a state procedural bar") (emphasis in original).

New York requires defendants to preserve challenges to a state court's legal rulings by objecting at a time when the trial court may act to correct the error.  CPL § 470.05(2) (providing that a question of law is presented when "a protest thereto was registered, by the party claiming error, at the time of such ruling . . . or at any subsequent time when the court had an opportunity of effectively changing the same.");  *People v. Luperon*, 85 N.Y.2d 71, 78 (1995) (noting the preservation rule requires, "at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.").  The Second Circuit has "held repeatedly" that this so-called "contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."  *Downs*, 657 F.3d at 104 (collecting cases).

The Third Department relied upon the contemporaneous objection rule in rejecting petitioner's unpreserved arguments in this case.  In "exceptional cases," the "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003).

In determining whether the application of an independent state rule was "exorbitant," the court should consider (1) whether the alleged procedural violation was actually relied upon by the trial court and whether perfect compliance with the state rule would have changed the trial court's decision, (2) whether state case law required compliance with the

rule in the specific circumstances, and (3) whether petitioner had "substantially complied" with the rule given the "realities of trial," and whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007) (quoting *Cotto*, 331 F.3d at 240). These *Cotto* factors are not all determinative, but are a guide to evaluate the state's interest in a particular rule in the circumstances of a particular case. *Id*. at 714.

This is not such an exceptional case. The Third Department's application of the preservation rule to bar Hughes's arguments, including his *ex post facto* argument, was consistent with the state's usual practice, and the record supports the court's conclusion that the claims were not raised in the trial court. *See, e.g., People v. Beaty*, 128 A.D.3d 1391, 1392 (4th Dep't 2015) (concluding that petitioner's argument that a penal law statute "constitutes an impermissible ex post facto law" was unpreserved and "without merit in any event"), *lv. denied*, 26 N.Y.3d 1038 (2015); *People v. Carey*, 92 A.D.3d 1224, 1224 (4th Dep't 2012) (finding unpreserved defendant's contention that "his conviction of [sexual conduct against a child in the first degree] violates the ex post factor prohibition," and declining to address that contention in the interest of justice), *lv. denied*, 18 N.Y.3d 992 (2012), *habeas denied sub. nom. Carey v. Superintendent*, No. 9:13-CV-0354 (FJS/RFT), 2015 WL 4740393, at *7-8 (N.D.N.Y. Aug. 10, 2015) (concluding that petitioner's ex post facto claim was barred from habeas review because the Appellate Division found that claim to be unpreserved pursuant to New York's contemporaneous objection rule); *see generally, e.g., People v. Padro*, 75 N.Y.2d 820, 820 (1990) ("A postverdict motion made pursuant to CPL 330.30 is not, by itself, ordinarily sufficient to preserve a 'question of law' within the meaning of CPL 470.05(2)[.]").

Accordingly, the Third Department's express invocation of the contemporaneous objection rule to dispose of Hughes's claims not previously discussed on the merits, including the claims in his posttrial motion, bars federal habeas review.  Petitioner can avoid that bar only by establishing cause for the default and resulting prejudice, or that a fundamental miscarriage of justice will result from the Court's failure to review his claim.  *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536-39; *Murray*, 477 U.S. at 496.  Upon review, petitioner has not established cause sufficient to excuse his default or actual resulting prejudice, and, as discussed above, he has not demonstrated that the failure to consider his claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  His claim is therefore barred.

Even if Hughes's claim were not barred from habeas review, the claim would be without merit.  As discussed above, C.D. testified that the encounter underlying the predatory sexual assault charge occurred during the summer between her time in fifth grade and sixth grade, and as, petitioner acknowledged, that summer break started in late June 2006.  Petitioner argues that "the first day of summer during that year was June 21, 2006."

The Court takes judicial notice of the fact that June 21, 2006, was a Wednesday. During his videotaped interview, which was admitted into evidence and played for the jury, petitioner stated that "people were at the house" on the day of the garage encounter, and that it was a weekend.  As a result, the record supports the conclusion that the jury convicted petitioner of count one based upon conduct that occurred on or after June 23, 2006, the effective date of the statute and as alleged in the indictment.

### E.  Legal Sufficiency of Other Counts and Double Jeopardy

Hughes contends that his convictions upon counts two, three, and four were also

unsupported by legally sufficient evidence.  Petitioner further contends that his convictions upon counts two, three, and four "must be vacated as the evidence is deficient and [he] is exposed to multiple punishments for the same conduct" in violation of principles of double jeopardy.  Finally, petitioner argues that the prosecution's "charging strategy" gave him "inadequate notice" with respect to these counts.

Count two charged Hughes with first degree rape and alleged that, on "an unknown date on or about and in between June 25, 2009 and September 9, 2009," he engaged in sexual intercourse with C.D. by forcible compulsion at his camp in East Berne, New York.  Count three charged petitioner with second degree rape and alleged that he engaged in sexual intercourse with C.D. when she was less than fifteen years old, during the same timeframe and at the same location as alleged in count two.  Count four charged petitioner with endangering the welfare of a child and alleged that, between June 23, 2006 and September 9, 2009, he "repeatedly subjected [C.D.] to various acts of sexual conduct."

### 1.  <u>Regarding Counts Two, Three, and Four</u>

On direct appeal, Hughes argued that his predatory sexual assault against a child conviction was not supported by legally sufficient evidence because the prosecution "failed to establish that this alleged offense occurred between" the dates alleged in the indictment. Petitioner also argued that the conviction for "this offense" was against the weight of the evidence.  In concluding his weight argument, petitioner contended conclusorily that "[t]he same is true with respect to the remaining charges upon which [he] was convicted."

The Third Department held that the jury's verdict was not contrary to the weight of the evidence, namely because (1) Hughes's admissions of "oral sexual conduct and sexual intercourse with the victim," including "telling details" that he supplied in his interview with law

enforcement, and (2) the victim's "unequivocal[]" testimony concerning the incidents at issue, as well as the jury's weighing of her credibility, which was "fully explored at trial." *Hughes*, 114 A.D.3d at 1022.  Consistent with the arguments raised by Hughes, the Third Department found the evidence legally sufficient to support the predatory sexual assault count, but did not address the issue of sufficiency with respect to the other counts.  *Id.* at 1021-22.

Under these circumstances, Hughes's legal sufficiency claim with respect to counts two, three, and four is unexhausted.  "[A]lthough sufficiency and weight of the evidence claims are related, 'each requires a discrete analysis.'"  *Pham v. Kirkpatrick*, 209 F. Supp. 3d 497, 512 (N.D.N.Y. 2016) (quoting *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987)), *aff'd*, 711 F. App'x 67 (2d Cir. 2018) (summary order).  New York's "weight-of-the-evidence claim requires more exacting review than an insufficiency claim, because it entails a weighing of the evidence and an assessment of the credibility of the State's witnesses."  *Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012) (citing *Bleakley*, 69 N.Y.2d at 495).

"Recent cases which have examined the nature of the weight of the evidence and sufficiency claims have concluded that 'a weight claim cannot stand in for a constitutional sufficiency claim when considering whether a habeas petitioner has exhausted state court remedies because the two claims are no more than somewhat similar.'"  *Pham*, 209 F. Supp. 3d at 512 (quoting *Lopez v. Superintendent of Five Points Corr. Fac.*, No. 1:14-CV-4615, 2015 WL 1300030, at *16 (S.D.N.Y. Mar. 23, 2015), *adopted*, 2015 WL 2408605, at *1 (S.D.N.Y. May 20, 2015); *see also, e.g., Shuler v. Artus*, No. 9:15-CV-0399 (DNH), 2016 WL 698106, at *4-5 (N.D.N.Y. Feb. 19, 2016) (concluding that petitioner's legal sufficiency claim was unexhausted, and that petitioner's weight-of-the-evidence claim on direct appeal did not "fairly present" a legal sufficiency claim to the state court); *Madrid v. Smith*, No. 2:08-CV-

5262, 2012 WL 912945, at *5 (E.D.N.Y. Mar. 13, 2012) (concluding that petitioner did not fairly present the his constitutional sufficiency claim by challenging the weight of the evidence on direct appeal).

Hughes argued on direct appeal that the predatory sexual assault against a child conviction was not supported by legally insufficient evidence, and the Third Department's opinion with respect to legal sufficiency was correspondingly limited to that charge.  *Hughes*, 114 A.D.3d at 1021-22.  Based upon a review of petitioner's appellate brief and the Third Department's analysis, petitioner expressly limited his legal sufficiency argument to count one, and thus did not "fairly present" a legal sufficiency argument as to counts two, three, and four in state court.  His sufficiency claim as to those counts on habeas review is therefore unexhausted.

In *Liberta v. Kelly*, 839 F.2d 77, 80 n.1 (2d Cir.1988), the Second Circuit remarked that "New York courts, when reviewing the evidence in support of a criminal conviction, have consistently adhered to a standard that is virtually identical to the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319[.]"  Some courts have concluded, based in part on the *Liberta* footnote, that by raising a weight of the evidence claim, petitioners necessarily have raised a sufficiency claim.  *See, e.g., Horne v. Perlman*, 433 F. Supp. 2d 292, 300 (W.D.N.Y.2006).

More recently, in *Parker*, the petitioner raised both a sufficiency claim and a weight claim on direct appeal.  The Appellate Division ruled that the sufficiency claim was unpreserved and declined to review it in the interest of justice, and rejected the weight of the evidence claim on the merits.  The Second Circuit noted that a weight claim "requires more exacting review than an insufficiency claim, because it entails a weighing of the evidence and

53

an assessment of the credibility of the State's witnesses," and found that "to the extent the Appellate Division decided that Parker's conviction was not against the weight of the evidence, it necessarily decided that there was sufficient evidence to support the verdict." 666 F.3d at 833.

But in this case, Hughes plainly limited his legal sufficiency claim to count one of the indictment. Petitioner's passing assertion that "the remaining charges upon which [he] was convicted" were against the weight of the evidence did not constitute the fair presentation of a sufficiency argument on those "remaining charges," as the Third Department's opinion reflects.

Hughes's sufficiency claim regarding counts two, three, and four is also procedurally defaulted because there is no remaining avenue by which he can properly exhaust it in state court. *Aparicio*, 269 F.3d at 90-91. The facts supporting his legal sufficiency claim were necessarily record-based and, like his sufficiency argument regarding count one, should have been raised on direct appeal. Petitioner can no longer file a direct appeal or leave application to exhaust these claims because a defendant is "entitled to one (and only one) appeal to the Appellate Division'" and "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal.'" *Id.* at 91 (citing CPL § 440.10(2)(c)); *see Clark*, 510 F.3d at 393.

Hughes has not established cause sufficient to excuse his default or actual resulting prejudice, and, as discussed above, he has not demonstrated that the failure to consider his claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536-39; *Murray*, 477 U.S. at 496. As a result, this claim is barred from habeas review.

54

Two further points.  First, to the extent that Hughes may be understood to argue that his conviction was against the weight of the evidence, such a claim is not cognizable on federal habeas review.  *See McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (summary order); *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006).  Second, even if petitioner had properly exhausted his legal sufficiency claim on these counts by arguing that the verdict was against the weight of the evidence, this argument would be without merit for the reasons set forth in respondent's memorandum of law.  R. Mem. at 27-28.

C.D. testified at trial that, when visiting the camp in the summer of 2009 (i.e., when she was fourteen years old), Hughes gave her and her underage step-siblings alcohol, brought C.D. into his trailer, directed her to remove her clothing, and raped her.  This was the only incident at the camp about which C.D. testified.  C.D. also testified that, during the relevant time period, petitioner, among other things, touched her buttocks and fondled her breasts.  C.D.'s stepbrother and stepsister testified that they both witnessed petitioner (their biological father) touch C.D.'s breasts "once in a while" and "[o]ccasionally," and her stepbrother recalled petitioner stating to C.D., "they're mine until you're 18."  In sum, the convictions were supported by legally sufficient evidence

## 2.  Double Jeopardy-Related Claims

On direct appeal, Hughes argued that the predatory sexual assault against a child, first degree rape, and second degree rape counts (i.e., counts one, two, and three) were duplicitous because C.D. testified that petitioner engaged in sexual intercourse with her ten or more times, but could provide no specific dates for those occurrences.  He also argued that count six, charging endangering the welfare of a child, was duplicitous.

The Third Department held that count six was not duplicitous, but concluded that Hughes's other duplicity-related contentions were among those arguments not preserved for review. *Hughes*, 114 A.D.3d at 1024. As discussed above, New York's "contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." *Downs*, 657 F.3d at 104 (collecting cases).[10] Moreover, nothing suggests that the appellate court's invocation of the preservation rule was exorbitant in this case, and petitioner does not argue to the contrary. *See Cotto*, 331 F.3d at 239-240.

Hughes's claim is therefore defaulted. Moreover, he has failed to establish cause sufficient to excuse his default or actual resulting prejudice, and, as discussed above, he has not demonstrated that the failure to consider his claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. His claim is therefore barred.

Even if these claims—which appear to concern both duplicity and multiplicity—were not barred, they would be without merit. "The rule against duplicity prohibits the Government from joining two or more distinct offenses in a single count, because if a jury were to return a general verdict on a duplicitous count, it would be unclear as to whether the defendant was found guilty of only one crime and not the other, or guilty of both." *United States v. Coffey*, 361 F. Supp. 2d 102, 109 (E.D.N.Y. 2005) (citing *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)); *see also United States v. Crisci*, 273 F.3d 235, 238 (2d Cir. 2001) ("The vice of a duplicitous charge is that it risks to impair a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution.") (internal quotation marks omitted).

---

[10] Petitioner appears to have acknowledged, in his appellate brief, that his duplicity argument was not preserved for review.

An indictment is constitutionally sufficient if "it charges a crime [1] with sufficient precision to inform the defendant of the charges he must meet and [2] with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *DeYonish v. Keane*, 19 F.3d 107, 108 (2d Cir. 1994).

As a result, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

The language of counts one through four of the indictment each charged Hughes with a single offense and each tracked the language of the respective statutes at issue. Petitioner claims that he is "unsure of what precise criminal acts he was convicted of," particularly because C.D. testified that petitioner "had intercourse with her approximately 10 times."

However, C.D. testified in the greatest detail about two specific incidents: the first, during which Hughes raped her in the garage of the family residence in the summer of 2006; and the second, during which petitioner raped her in a trailer at his camp in the summer of 2009.

There is no basis in the record for concluding that Hughes's comparatively briefer testimony about other incidents of sexual intercourse occurred rendered the convictions duplicitous. *See generally, e.g, People v. Spencer*, 119 A.D.3d 1411, 1412 (4th Dep't 2014), *lv. denied*, 24 N.Y.3d 965 (2014) ("The victim testified in detail about those two incidents, during which defendant sodomized and raped her, and she then testified that the abuse 'became a regular thing,' happening several times a week until she left home at age 17, in 2006. . . . [I]n light of the victim's specific and detailed testimony about the first two incidents, there is no reasonable possibility that the jurors may have convicted defendant of any of the

first six counts based on the general and vague testimony that followed[.]").

The prosecutor's summation also specifically argued that count one concerned "the first sexual assault," which occurred "between the summer of fifth and sixth grade" in the "garage at their home in Watervilet," and that counts two and three concerned "the last rape," which occurred "in Berne at [petitioner's] camp."

Based on the foregoing, Hughes's claims are barred and lack merit. Moreover, petitioner's convictions for first degree rape based upon forcible compulsion (Penal Law § 130.35(1)) and for second degree rape based upon the fact that he was more than eighteen years old and C.D. was less than fifteen years old (Penal Law § 130.30(1)), while both pertaining to the single incident at petitioner's camp in the summer of 2009 described by C.D. at trial, were not multiplicitous.

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Aparicio*, 269 F.3d at 97 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Counts two and three each concerned a different fact not common to the other, that is, the ages of the parties and the use of forcible compulsion. Additionally, the state court imposed concurrent sentences with respect to those counts.

## V. **CONCLUSION**

Therefore, it is

ORDERED that

1. The amended petition for a writ of habeas corpus (Dkt. No. 13) is **DENIED and DISMISSED**;

58

2.  No Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[11] and

3.  The Clerk shall serve a copy of this Decision and Order on the parties.

IT IS SO ORDERED.

Dated:  May 1, 2018
        Utica, New York.

_____
United States District Judge

---

[11] *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (holding that "§ 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right'"); *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation") (citation omitted) (emphasis in original)).